FILED 17 NOV '25 14:46 USDC-ORE

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
### EUGENE DIVISION

JARED LANE WISE                 Case No. 6:24-CV-02009-AP

    Plaintiff

    v.

GREGORY EDMONT DE LA DOUCETTE

    Defendant

_____

## **RESPONSE TO DEFENDANT'S MOTION TO QUASH**

### **Request for Oral Argument**

1.      Jared Lane Wise (Plaintiff) files this Motion in response to Defendant's Motion to Quash (ECF 22) and to request that the Court: 1) deny Defendant's Motion to Quash in its entirety; 2) preserve the existing status of Default by Defendant entered by the Clerk of the Court (ECF 18) and; 3) if necessary, hold an in-person evidentiary hearing requiring the physical presence of both the Plaintiff and Defendant while allowing for testimony, cross-examination and submission of evidence.

2.      Defendant's Motion to Quash (ECF 22) is vague, lacks evidence, makes claims that are not credible, concedes liability on his part, and fails on multiple fronts to meet standards required to set aside an existing entry of Default by the Clerk of the Court.

3.      Service was completed in a proper manner under the Federal Rule of Civil Procedure 4(f)(1), the Hague Service Convention, and French law, as confirmed by the certificate

(ECF 12) from the French Commissaire de Justice (Commissaire). Plaintiff retained an experienced international process server who coordinated the service upon Defendant in France using the French Central Authority and the Commissaire as required by the Hague Convention. Successful and proper service was documented in detail by the Plaintiff in this case (ECFs 9, 10, 11 and 12).

4.    The Commissaire's certification creates a presumption of valid service that can only be overcome by the Defendant with strong evidence. A self-serving affidavit claiming non-receipt of service is insufficient to quash service of process. Courts have consistently held that a properly filed proof of service creates a rebuttable presumption of proper service. For example, in the Ninth Circuit, a simple affidavit denying receipt does not suffice to rebut this presumption. Instead, the defendant must provide strong and convincing evidence to challenge the validity of service. (*In re Bucknum*, 951 F.2d 204, 206-207 (9th Cir. 1991).

5.    Similarly, in *Hilton v. Hongisto (In re Hongisto)*, 293 B.R.45, the court held that a mere denial of receipt was insufficient to rebut the presumption of proper service established by a proof of service affidavit, and in Berry v. United States Tr. (In re Sustaita), 438 B.R. 198, the court noted that self-serving statements alone do not meet the clear and convincing evidence standard required to rebut the presumption of proper service.

6.    Defendant's self-serving denial with no supporting evidence falls woefully short of the standard and therefore, on that basis alone, his motion should be denied.

7.    Additionally, pursuant to *United States v. Mesle*, 615 F.3d 1085 (9th Cir. 2010), the Defendant is required to show "good cause" to vacate a default, which includes: 1) whether the party seeking to set aside the default engaged in culpable conduct that led to the default; 2) whether the party has a meritorious defense and; 3) whether setting aside the default would prejudice the

opposing party. As set forth in the motion below, Defendant fails on each of these factors, and for that reason as well, his Motion to Quash should be denied.

## FACTUAL BACKGROUND

8.    This lawsuit stems from Defendant's fraud scheme, described in detail in the initial Complaint (ECF 1), to steal from Plaintiff related to Plaintiff's investment in a rural property in France near Saint-Michel-de-Dèze, Lozère, France, alternatively known as "La Combe de Ferriere" or "Chateau de Gabriac" ("Property"). The agreement presented by Defendant to Plaintiff was for a joint purchase of the Property between Plaintiff and Defendant at a price of €1,565,000, and Plaintiff subsequently wired $189,313.89 to the Defendant to purchase a portion of the Property, but instead Defendant secretly purchased the Property and associated business in Defendant's name only for a much lesser price of €655,000, while continuing to tell Plaintiff that Plaintiff held an ownership position and the purchase price was the higher amount. Defendant also stole another €2,500 from Plaintiff before 2021 as described in the Complaint. Defendant's fraud scheme included his creation of forged documents and a series of lies in which he unsuccessfully attempted to cover up his fraud and steal even more money from Plaintiff. In the end, Plaintiff has never held any ownership position in the property or related businesses.

9.    The Property, currently owned by the Defendant, is Defendant's last known residential address, the current address of at least two French corporations ("Holding GED" and "Domaine de Gabriac") that Defendant operates from the Property, and the physical location used by a non-profit Texas corporation ("Edmont Foundation") which Defendant founded and currently serves as a Director and Registered Agent.

10.    Defendant acknowledges in his sworn declaration attached as the only Exhibit to his Motion to Quash (ECF 22, Exhibit A, hereinafter "Defendant's Declaration") that "the property is "currently being developed and operated [by the Defendant] as a charitable foundation site" and the Edmont Foundation website is clear that it is using the Property to provide its services.

**Procedural History of this lawsuit**

11.    Plaintiff filed suit on December 3, 2024. (ECF 1). On April 4, 2025, Plaintiff meticulously complied with international service rules and successfully served the Summons and Complaint on Defendant via Crowe Foreign Services, the French Central Authority and a French Commissaire de Justice (ECFs 9, 10, 11 and 12). The French Central Authority forwarded the documents to a Commissaire de Justice, who effected service by delivering the documents to the Saint-Michel-de-Dèze address under Article 5a of the Hague Convention and returned a completed Certificate of service (ECF 12). This address is Defendant's last known domicile, the current address for at least two French companies owned by Defendant, and where Plaintiff has understood Defendant to live since 2021.

12.    Defendant did not respond to the Complaint within 90 days, so on July 22, 2025, Plaintiff filed a Motion for Default Judgment. (ECF 14). On August 13, 2025, the motion was denied without prejudice by the Court because Plaintiff, who is acting pro se, did not follow the proper procedure of first filing for a Default with the Clerk. (ECF 15). On August 15, 2025, before filing for a default with the Clerk, Plaintiff went above and beyond by providing additional notice to Defendant—which he had no obligation to do—by emailing Defendant using three different email addresses that Defendant had previously used to communicate with Plaintiff for years. Plaintiff made a sincere offer to ensure fair notice and confer on the matter. The emails did not

bounce back, but Defendant did not respond to Plaintiff. (ECF 17). On September 5, 2025, Plaintiff filed for an Entry of Default with the Clerk, and the Clerk entered Default on September 16, 2025. (ECF 18). On September 22, 2025, Plaintiff mailed his Second Motion for Default Judgment. The Second Motion for Default was filed by the Court on September 29, 2025, and is currently pending. (ECF 19).

13.     On November 3, 2025, seven months post-service and five weeks after Plaintiff filed his second Motion for Default Judgment (ECF 19), Defendant noticed his appearance for the first time and then filed his Motion to Quash (ECF 22) on November 6, 2025, which was his first and only entry in this matter.

## LEGAL STANDARD

14.     The Commissaire's certification creates a rebuttable presumption of valid service that can only be overcome by the Defendant with strong evidence. A self-serving affidavit by the Defendant claiming non-receipt of service is insufficient to quash service of process. Courts have consistently held that a properly filed proof of service creates a rebuttable presumption of proper service.

15.     For example, in the Ninth Circuit, a simple affidavit denying receipt does not suffice to rebut this presumption. Instead, the defendant must provide strong and convincing evidence to challenge the validity of service. Where the bankruptcy court record shows a certificate of mailing and a complaining party submits an affidavit declaring notice was not received, the weight of the evidence favors the court's certificate. If a party were permitted to defeat the presumption of receipt of notice resulting from the certificate of mailing by a simple affidavit to the contrary, the scheme of deadlines and bar dates under the Bankruptcy Code would

come unraveled. For this reason, an allegation that no notice was received does not, by itself, rebut the presumption of proper notice. (*In re Bucknum*, 951 F.2d 204, 206-207 (9th Cir. 1991).

16.    Similarly, in *Hilton v. Hongisto (In re Hongisto)*, 293 B.R.45, the court held that a mere denial of receipt was insufficient to rebut the presumption of proper service established by a proof of service affidavit, and in *Berry v. United States Tr. (In re Sustaita),* 438 B.R. 198, the court noted that self-serving statements alone do not meet the clear and convincing evidence standard required to rebut the presumption of proper service.

17.    The legal standard in the Ninth Circuit for vacating an entry of default by the clerk pursuant to Federal Rule of Civil Procedure 55 is the "good cause" standard. Under this standard, courts consider three factors: 1) whether the party seeking to set aside the default engaged in culpable conduct that led to the default; 2) whether the party has a meritorious defense and; 3) whether setting aside the default would prejudice the opposing party. These factors are disjunctive, meaning that a finding of any one factor being true can justify denying the Defendant's motion to set aside the default. *United States v. Mesle,* 615 F.3d 1085 (9th Cir. 2010).

## ARGUMENT

**Defendant was properly served and fails to meet the standard of evidence required to rebut presumed proper service**

18.    Defendant was successfully and properly served by Plaintiff in accordance with Federal Rules of Civil Procedure 4(f)(1), in compliance with the Hague Convention, and consistent with French law (ECFs 9, 10, 11 and 12). The Commissaire delivered the documents at the Property after verifying that Defendant's name was on the mailbox. The Commissaire confirmed

proper service by completing a Hague Convention Certificate of service under method 5a (ECF 12).

19.    The French Commissaire's certification (ECF 12) establishes a rebuttable presumption that service was properly and successfully affected (*In re Bucknum*, 951 F.2d 204, 206-207 (9th Cir. 1991). Rebuttal of this presumption requires "strong and convincing evidence", but in Defendant's Motion to Quash (ECF 22), he provides no evidence at all other than his self-serving affidavit and fails completely in satisfying his burden to rebut that presumption. In *Hilton v. Hongisto (In re Hongisto)*, 293 B.R.45, the court held that a mere denial of receipt was insufficient to rebut the presumption of proper service established by a proof of service affidavit, and in *Berry v. United States Tr. (In re Sustaita)*, 438 B.R. 198, the court noted that self-serving statements alone do not meet the clear and convincing evidence standard required to rebut the presumption of proper service.

**Defendant's claims about his residency and location are not supported by evidence**

20.    Defendant claims in his Motion to Quash that *"Since 2024, Defendant has resided principally in Finland. Defendant owns a rural property in Saint-Michel-de-Dèze, Lozère, France, which is visited only periodically and is currently being developed and operated as a charitable foundation site. The property is not Defendant's residence or habitual place of living"* (ECF 22, Page 2, Paragraph 1), but Defendant fails to provide a single piece of evidence that his "residence" or "habitual place of living" is anywhere other than the Property.

21.    Defendant claims in his Motion to Quash that *"Defendant was in France from October 12, 2024 through January 20, 2025. He did not return to France until early June 2025 and left again shortly thereafter. He returned once more for a brief visit in September 2025 and*

*departed again on September 30, 2025. Defendant was therefore not present in France during the period in which Plaintiff claims service was attempted"* (ECF 22, Page 2, Paragraph 2). Defendant fails to provide a single piece of evidence of his presence anywhere other than France at any of those times.

22.    Defendant claims that *"at the time of purported service attempts Defendant was residing in Finland and was not present in France"* (ECF 22, Page 4, Paragraph 2), but Defendant fails to provide a single piece of evidence to support his residence being in Finland nor him being anywhere else than France at that time.

23.    Plaintiff meticulously complied with all requirements for proper international service, has a rebuttable presumption of proper service, and Defendant provided no evidence at all to support his self-serving claim in the Affidavit that he was not properly served, so Defendant fails on that factor alone.

**Defendant lacks credibility in general and his claims about not receiving service and his location at various times are suspect**

24.    Defendant is clearly flexible in claiming the location of his residency to be wherever it best suits him for any given situation, as Plaintiff is aware of three instances in just 2025 alone where Defendant claims the France Property or a Texas address as his official residence – all of which occurred during the time period he claims in his Affidavit to have "principally resided" in Finland.

   a. On January 7, 2025, a French Gendarmerie (law enforcement) form, apparently documenting an interview with Defendant related to the fraud

scheme alleged by Plaintiff, lists the Property as the address of Defendant (Exhibit 1).

b.  On June 25, 2025, the Defendant completed and signed Texas Department of State form 202 "Certificate of Formation Nonprofit Corporation" to register the Edmont Foundation as a Texas non-profit corporation.  The form listed Defendant as the "Registered Agent" and a "Director" and he confirmed that he will "maintain a physical address in the state".  Texas law requires that the Registered Agent for a non-profit corporation be a Texas resident, so Defendant executed the form certifying that he resides at an address in Sulphur Springs, Texas.  Interestingly, the same form lists Jani Siivola as another Director of the Edmont Foundation who also resides in Sulphur Springs, TX.  The Edmont Foundation website lists Jani Siivola as a "former Finnish soldier" who is the "Property Manager and Technical Steward" of the France Property.  Plaintiff believes that Siivola lives in either Finland or at the France Property rather than in Sulphur Springs as Defendant claimed on the form.  Plaintiff believes the claim of Siivola living in Sulphur Springs, TX to be another false claim knowingly verified by Defendant (Exhibit 2).

c.  On November 12, 2025, the French government website "L'Annuaire des Entreprises" or "Business Directory" with URL "https://annuaire-entreprises.data.gouv.fr", which lists information for corporations in France, listed the current business address of Defendant's companies "Holding GED" and "Domaine de Gabriac" as being the Property.  The

website characterizes both of the Defendant's companies as "En Activite" or "Active" entities (Exhibits 3 and 4).

25.    Defendant claims in his affidavit that *"Defendant was in France from October 12, 2024 through January 20, 2025. He did not return to France until early June 2025 and left again shortly thereafter. He returned once more for a brief visit in September 2025 and departed again on September 30, 2025"* (ECF 22, Page 8, Paragraph 3). This appears to be inconsistent with "testimonials" present as of November 12, 2025 on the Edmont Foundation website. The website claims that these testimonials are "from guests and volunteers" for the Edmont Foundation. The website contains 17 testimonials, and 12 of them describe or imply personal interaction with Defendant onsite at the Property. One of the testimonials describes staying at the property "for over a month", and another "nearly three weeks" and both mention spending time with Defendant at the Property. The Edmont Foundation was first established on June 25, 2025 (Exhibit 2), so these interactions at the Property had to have taken place following that date, meaning that Defendant appears to have been physically present at the Property quite often after June 25, 2025. This appears contradictory to his claims in his Affidavit to have arrived in France in "early June", then left "shortly thereafter" and only returned to France for a "brief visit" in September, 2025. One "brief visit" in September would not provide enough time in France to match the length of stays and interactions with Defendant described in the testimonies. Portions of several of the testimonials are listed below.

    a. Markus, 21, Germany – "…Greg's place is really beautiful and peaceful. It has a great kind of energy. I felt so good there. I really enjoyed his company…"

b. David, 30, Czech Republic – "...I was instantly welcomed by Gregory and all the animals...I was lucky enough also to experience olive picking with Gregory at his olive grove in Provence..."

c. Sam, 22, USA – "...Gregory, for instance, is always joking and will have you laughing from the moment you arrive..."

d. Jozsef, 55, Hungary – "...Greg and Jani were the perfect hosts...Thank you Greg and Jani, I dearly hope to see you again."

e. Sebastian, 28, Spain – "...my time spent with Greg at this place was amazing...planned to stay two weeks and ended up staying over a month...a couple of times a week Greg would make dinner..." (Exhibit 5)

f. Jacqueline, 28, Israel – "I spent nearly three weeks as a volunteer at Greg's beautiful place...he is a very kind, welcoming and respectful host...every day I helped Greg and Jani to truly help other people..." (Exhibit 6)

g. Harvey, 23, UK – "...on special occasions Greg ordered home made pizza from the local baker or cooked up a storm...

26.    Defendant has a publicly documented history of being untruthful as described in a 2002 article by the Guardian newspaper and documented in ECF 6. In the article, Defendant is accused by multiple named individuals of repeatedly lying about his writing career.

27.    Defendant has a history of forging documents, including impersonating a French Notaire by creating a fake Power of Attorney and sending to Plaintiff at the beginning of the fraud scheme. Defendant told Plaintiff that the document was drafted by a Notaire (the same Notaire who later conducted the actual transaction for the Property). When Plaintiff's French attorney later contacted the Notaire, the Notaire denied drafting the document. Defendant also sent French

incorporation documents to Plaintiff in October, 2021 that were titled "HOLDING GEDJW" for a company that Defendant had claimed already existed, but they were fake and the company has never existed.

**Defendant engaged in culpable conduct that led to the default**

28.     Defendant failed to respond to proper service of Summons and the Complaint within the 90-day requirement for individuals living outside the United States.    Following Defendant's lack of response, Plaintiff sought an entry of Default by the Clerk and a Default Judgment by the Court.

29.     Defendant claims in his Motion to Quash that *"Defendant first became aware of this action only after being indirectly informed of its existence by a third party. Upon first learning that this case had been filed, Defendant acted promptly to investigate the status of the proceedings and immediately sought to notify the Court of the lack of proper service and personal jurisdiction"* (ECF 22, Page 3, Paragraph 4).   Defendant also states in his Motion to Quash that *"In early 2025, my Workaway account was unexpectedly suspended despite a record of positive host reviews. Workaway initially informed me only that the suspension was "under standard review." Over several months, I made repeated inquiries requesting clarification. Ultimately, a Workaway representative informed me that the suspension had resulted from a third-party complaint referencing a civil matter in the United States and alleging "illegal ownership" of the hosting property. The representative also stated that Workaway had been advised not to provide further information. This was the first indication to me that any civil lawsuit had been filed in the United States. I then conducted my own search of public court records and located this case"* (UCF 22, Pages 8-9, Paragraph 5).

30.    In these two statements, Defendant acknowledges first learning of a problem with his Workaway account "in early 2025" and then Defendant made inquiries to Workaway for "several months" until a Workaway representative "ultimately" informed him of a third-party complaint referencing a civil matter in the United States, which was his "first indication" that a civil lawsuit had been filed in the United States. Defendant claims to have then begun to conduct his "own search of public court records and located this case" and upon "first learning that this case had been filed", the Defendant "immediately" sought to notify the Court of his concerns.

31.    Defendant is purposely vague and imprecise in his description of these events which makes it difficult to understand exactly when he is claiming to have learned of the lawsuit. He provides no specific date for any of the events he mentions, including when he was made aware of a problem with his Workaway account, when he was informed by the Workaway representative of the third-party complaint referencing a civil matter in the United States, when he began his own search of public court records, or when he located this case. Defendant offers no definitions for "early 2025", "several months", "ultimately", "promptly" and "immediately" that he uses to describe the sequence of events. The timing should be easy for him to verify via emails, phone calls, or other records, in order to provide specific dates, yet he did not. Defendant does not want to provide specific details, but rather prefers to give vague statements that are difficult to disprove but imply good faith on his part.

32.    Plaintiff sent an email to Defendant on August 15, 2025, addressed to three email addresses Defendant has used with Plaintiff for many years, in which Plaintiff mentioned this lawsuit and made a sincere offer to confer on the matter (ECF 17). The email did not bounce back as undeliverable for any of Defendant's three email addresses, but Defendant never replied to

Plaintiff. Defendant did not mention this email in his affidavit but it seems likely that he received it and would have been made aware of this lawsuit if he was not already.

**Defendant has not put forth a valid meritorious defense**

33.     Defendant claims a meritorious defense by having returned €156,500 to Plaintiff. Defendant admits doing so at the direction of a French prosecutor who was investigating his fraud scheme. Defendant asserts that the *"underlying financial matter has already been fully resolved through the French public prosecutor's directives"* (ECF 22, Page 5, Paragraph 1), but this is no defense at all, and instead is an admission of liability. Defendant acknowledges that his return of €156,500 to Plaintiff was "restitution" (ECF 22, Page 3, Paragraph 5) at the direction of a French prosecutor who was investigating his fraud, which indicates Defendant's acceptance of liability for causing the loss.

34.     Defendant also presented no evidence of possessing a meritorious defense against Plaintiff's allegations because Defendant did not even deny the crime of which he is accused and failed to address the elements of fraud in any manner. What is notably missing from Defendant's Motion to Quash is a single denial of even one of the allegations made against him by Plaintiff. The instinctual reaction of an innocent person being falsely accused would be to vehemently deny the allegations, but quite tellingly, Defendant doesn't lodge a single objection or effort to deny Plaintiff's claims in his brief discussion of a meritorious defense.

35.     Defendant writes in his Motion to Quash (ECF 22) *"On December 31, 2024, Defendant transferred €156,500 to CARPA (Caisse des Règlements Pécuniaires des Avocats), the attorney-regulated escrow account used for court-supervised restitution in France. CARPA confirmed receipt of the funds on January 16, 2025 and subsequently released the funds directly*

*to Plaintiff's French attorney. Plaintiff has therefore already been fully compensated."* This is
not true for two reasons.

**First reason: Defendant's claim about the timing of the money being returned to Plaintiff's
attorney is false**

36.    Plaintiff has a primary French attorney ("Primary Attorney") who speaks English
and with whom Plaintiff communicates directly, and the Primary Attorney has also retained a local
French attorney ("Local Attorney") who works closer to the remote location of the property, and
a Commissaire de Justice (not the same one who served Defendant in this lawsuit) who serves
documents and files public notices[1].

37.    On September 24, 2025, Defendant's attorney emailed Plaintiff's French
Commissaire de Justice and notified him that Defendant's attorney has money in his account for
Plaintiff and it will be transferred to Plaintiff's Local Attorney soon, by writing (translated here
via Google from the original French) "I confirm that the funds are held in CARPA… and should
be released to (Plaintiff's Local Attorney), and "the CARPA transfer may even have been
completed today" (Exhibit 7). Plaintiff was not aware of this email at that time, and did not know
of the existence of Defendant's attorney, nor any claim by Defendant's attorney that he would
soon transfer money to Plaintiff's local French attorney. It is clear from the email that as of

---

[1] Plaintiff has filed a separate but related lawsuit against Defendant in France. Plaintiff is not
familiar with French law and has not been directly engaged in that process because he does not
speak French, has no familiarity with the French legal system, and he has an attorney there, but
Defendant has followed the same general strategy in that matter as he has in this lawsuit by
completely ignoring the process. It is Plaintiff's understanding that Defendant did not contest or
participate in the French lawsuit and that he has not submitted a single document despite being
aware of the legal process since 2023.

September 24, 2025, the €156,500 remained in the control of Defendant's attorney and that Plaintiff had received nothing.

38.     On September 26, 2025, Plaintiff was notified for the first time via email from his Primary Attorney that Defendant allegedly has an attorney and that the attorney claims to be holding money in his CARPA account that will be transferred to Plaintiff's Local Attorney. Plaintiff's Primary Attorney also forwarded Plaintiff the September 24, 2025 email from Defendant's attorney to Plaintiff's Commissaire de Justice. This was the first time throughout this entire experience that Plaintiff has heard that Defendant has an attorney in France, or any mention of Defendant allegedly providing money to be returned to Plaintiff. Plaintiff's Primary Attorney wrote to Plaintiff on September 26, 2025 stating that he was skeptical that the attorney was really representing the Defendant or that any money was going to be transferred to Plaintiff.

39.     On September 29, 2025, Plaintiff was notified for the first time via email from his Primary Attorney that Defendant's alleged attorney seems to actually be representing Defendant, and that Plaintiff's Local Attorney claimed that he just received €156,500 from Defendant's attorney via transfer to his CARPA account. This is the first time Plaintiff heard that money had actually been transferred from Defendant's attorney to Plaintiff's Local Attorney.

40.     On November 3, 2025, Plaintiff was notified for the first time via email from his Primary Attorney that Plaintiff's Primary Attorney had received the money himself. This was the first time that Plaintiff was aware that the funds were under the direct control of his Primary Attorney, but as of the date of this filing, Plaintiff has not personally received any money, as the funds remain with his Primary Attorney.

**Second reason: Defendant has not returned Plaintiff's full initial investment and has done nothing to address Plaintiff's other damages, so Plaintiff is not "fully compensated"**

41.    Despite Defendant's attorney returning €156,600 to Plaintiff's Local Attorney in France around September 29, 2025, Defendant has not returned the full original investment amount of $191,808.19 requested by Plaintiff in the original complaint.  Due to exchange rate changes between the United States Dollar and Euro, €156,500 represents less today than the amount of $189,133.19 Plaintiff of Plaintiff's investment in 2021 that Defendant stole (as of the date of this filing, the exchange rate is approximately $1.16/€, giving the €156,500 a current value of $181,540.  That value will continue to change daily with exchange rates).  In addition, Defendant's return of €156,500 does not address in any manner the additional €2,500 that Defendant stole from Plaintiff prior to 2021 as claimed in the Complaint, valued at approximately $2,900 at the current exchange rate.

42.    Plaintiff will also incur significant additional attorney fees to be paid related to recovery of the €156,500, and Plaintiff's multiple other damages described in the Complaint and Motion for a Default Judgment are unaffected by the return of €156,500.  Lastly, even though Plaintiff's Primary French Attorney has taken control of the money, Plaintiff has not yet received any part of it.  For all these reasons, Defendant's claim that Plaintiff has "already been fully compensated" is false.

**Setting aside the Default would severely prejudice the Plaintiff and potentially allow the Defendant to abscond and escape restitution**

43.    Plaintiff believes that Defendant is seeking to delay a ruling in this lawsuit for as long as possible to provide him an opportunity to hide and protect assets from Plaintiff.  Defendant

has proven that he possesses the ability to move around the world as he now claims to be in Finland and owns a property in France. He is a United States citizen and permanent resident in a European Union country which allows him easy access to much of the world if he sought to travel to hide assets. Defendant speaks French fluently which also creates additional opportunities to hide assets in French speaking countries. In June, 2024, Defendant told Plaintiff that he was "donating" the Property to a foundation he was in the process of creating, which Plaintiff clearly understood to be an effort by Defendant to shield the Property from Plaintiff.

44.    It has been nearly five years since Defendant began his fraud scheme against Defendant. Since that time, Plaintiff has diligently and precisely pursued expensive legal action against the Defendant in both the United States and France, causing him to spend significant additional funds just for the hope of obtaining compensation. Defendant's actions were conducted with malice and done in a manner to inflict as much pain as possible to Plaintiff. Defendant should not be allowed to continue to benefit and continue his assault on Plaintiff by simply ignoring the justice system and feigning ignorance.

## IF NECESSARY, COURT SHOULD HOLD AN IN-PERSON HEARING

45.    If the Court is inclined to grant Defendant's Motion to Quash, Plaintiff requests that in the interest of efficiency, economy and fairness to Plaintiff, the court hold an in-person evidentiary hearing to thoroughly discuss the matter before issuing a ruling. As Plaintiff has taken great care to ensure service was proper, and Defendant has responded for the first time at the last minute, at a minimum Defendant should be required to appear in front of the Court in person and make his claims directly to the Court under oath.

46.    Plaintiff requests that in this hearing the Court allow testimony and cross-examination in order for Plaintiff to contest Defendant's claims and expose his continuing efforts to avoid responsibility. Both parties are Pro Se, which is conducive to a productive hearing in which both parties can testify under oath to the Court, submit evidence, and make any arguments in favor or opposition to the Defendant's Motion to Quash (ECF 22) in the physical presence of the Court.

47.    Defendant claims in his Affidavit that *"if called to testify, I could and would competently do so"*, and the Court should ask him to honor that statement in order to conduct the most thorough examination of his claims in his Motion to Quash (ECF 22) via an in-person hearing.

## PLAINTIFF WILL PROVIDE REVISED COMPENSATION REQUESTS

48.    At the appropriate time, Plaintiff will provide a revised list of compensation demands to reflect the partial return of Plaintiff's initial investment by Defendant. Once Plaintiff receives the money himself from his Primary Attorney, he will be able to calculate the precise reduction in the claim for the initial investment made by Plaintiff. Plaintiff will also increase his claim for attorney fees due to the portion of the money returned by Defendant that Plaintiff must pay to his French attorney.

WHEREAS for the foregoing reasons the Plaintiff requests that the Court: 1) deny Defendant's Motion to Quash in its entirety; 2) preserve the existing status of Default by Defendant entered by the Clerk of the Court (ECF 18) and; 3) if necessary, hold an in-person evidentiary

hearing requiring the physical presence of both the Plaintiff and Defendant while allowing for testimony, cross-examination and submission of evidence.

DATED this 13th day of November, 2025.

_____

Jared L. Wise, Pro Se



EXHIBIT 1

**GENDARMERIE NATIONALE**
Groupement de gendarmerie de la Lozère

**ENQUÊTE PRÉLIMINAIRE**

**PROCÈS-VERBAL D'AUDITION**

BR MENDE

| Code unité | Nmr P.V. | Année | Nmr dossier justice | TÉMOIN | | Nmr pièce | N° feuillet |
|------------|----------|-------|---------------------|--------|---|-----------|-------------|
| 04787 | 00051 | 2023 | | | | | 1 / 2 |

Le mardi 07 janvier 2025 à 14 heures 50 minutes.
Nous soussigné Adjudant Olivier LAMOLLE, Officier de Police Judiciaire en résidence à MENDE
Vu les articles 16 à 19 et 75 à 78 du Code de Procédure Pénale.
Nous trouvant au bureau de notre unité à MENDE 48000, rapportons les opérations suivantes :

## IDENTITÉ DE LA PERSONNE TÉMOIN

| Sexe | Nom | | Prénom(s) | |
|------|-----|---|-----------|---|
| M | **EDMONT DE LA DOUCETTE** | | **Grégory** | |

| Situation de famille | | Validité d'état civil | |
|----------------------|---|----------------------|---|
| Célibataire | | Identité déclarée | |

| Date naissance | Commune naissance et Code Postal | Pays | INSEE |
|----------------|----------------------------------|------|-------|
| 22/10/1966 | BOSTON | Etats-unis | |

| Adresse | La Combe de Ferrière (Camping) | | |
|---------|-------------------------------|---|---|

| Commune résidence et Code Postal | | Pays | INSEE |
|----------------------------------|---|------|-------|
| SAINT MICHEL DE DEZE 48160 | | France | 48173 |

| N° de téléphone | N° tph portable | Profession | Nationalité |
|-----------------|-----------------|------------|-------------|
| | 06.95.96.17.65 | SCENARISTE | AMÉRICAINE |

| e-m@il | gedmont@live.fr | | Fax | |
|--------|-----------------|---|-----|---|

Consentement Portails : non

## COMMUNICATION PAR VOIE ÉLECTRONIQUE AU COURS DE LA PROCÉDURE

La personne dénommée ci-dessus accepte de recevoir communication des avis, convocations et documents intéressant la procédure par voie électronique.
Cette communication pourra se faire par e-mail à l'adresse suivante : gedmont@live.fr et par SMS au numéro de téléphone suivant : 06.95.96.17.65
La personne est informée qu'elle peut se désister de ce consentement à tout moment de la procédure ou signaler tout changement concernant le mode de communication choisi ou les coordonnées fournies. Durant l'enquête de gendarmerie, cette démarche devra s'effectuer directement dans les locaux de l'unité en charge de la procédure. A l'issue de cette phase d'enquête, la personne entendue devra s'adresser au greffe de la juridiction saisie de son dossier.

## ENREGISTREMENT DES DONNÉES À CARACTÈRE PERSONNEL

Information à l'intéressé

La personne entendue est informée que conformément à la loi du 6 janvier 1978, ses données à caractère personnel collectées dans le présent procès-verbal sont enregistrées et utilisées par la gendarmerie nationale dans le traitement LRPGN autorisé par décret n° 2011-111 en date du 27 janvier 2011 modifié et destiné à faciliter le traitement de la procédure.

Elle est également informée :
- que le délégué à la protection des données du ministère de l'intérieur sis Place Beauvau, 75008 Paris Cedex contrôle ce traitement.
- que pour exercer ses droits d'accès, de rectification, d'effacement et de limitation, elle doit adresser directement auprès de la direction générale de la gendarmerie nationale sise au 4 rue Claude Bernard, 92130 Issy-les-Moulineaux.
- qu'elle peut également adresser une réclamation auprès de la commission nationale de l'informatique et des libertés (CNIL) sise au 3 place de Fontenoy, TSA 80715 75334 PARIS Cedex.7

## PROTECTION JURIDIQUE DE LA PERSONNE

La personne n'est ni sous tutelle, ni sous curatelle ou protection de justice.

**La personne entendue**

**L'Officier de Police Judiciaire**

Natinf 60 : ABUS DE CONFIANCE - Période du 25/01/2021 à 00:00 au 16/08/2024 à 00:00 - HABITATION INDIVIDUELLE - La Combe de Ferrière (Camping) - SAINT MICHEL DE DEZE 48160 (France) (Insee:48173) (Coordonnées=GPS : X:3.880204 - Y:44.254683)
Natinf 69 : FAUX : ALTERATION FRAUDULEUSE DE LA VERITE DANS UN ECRIT - Période du 24/01/2021 à 00:00 au 16/08/2021 à 00:00 - HABITATION INDIVIDUELLE - La Combe de Ferrière (Camping) - SAINT MICHEL DE DEZE 48160 (France) (Insee:48173) (Coordonnées=GPS : X:3.880204 - Y:44.254683)
Natinf 70 : USAGE DE FAUX EN ECRITURE - Période du 24/01/2021 à 00:00 au 16/08/2021 à 00:00 - HABITATION INDIVIDUELLE - La Combe de Ferrière (Camping) - SAINT MICHEL DE DEZE 48160 (France) (Insee:48173) (Coordonnées=GPS : X:3.880204 - Y:44.254683)

PV n° 04787/00051/2023                     Pièce n°                     Feuillet n° 2 / 2

**AUDITION**

Entendons la personne dénommée ci-dessus qui nous déclare :

Je me présente ce jour dans vos locaux suite à votre convocation. Vous m'informez que je suis entendu en tant que témoin afin que vous me remettiez les objets qui m'ont été saisis le 07 octobre 2024 dans le cadre de la perquisition de mon domicile et mon placement en garde à vue. —

*Question* : Reconnaissez-vous avoir versé 156 500 € à la CARPA du barreau de la Lozère le 31 décembre 2024 afin que cette somme soit remise à la victime, Jared WISE ?

*Réponse* : Oui, je reconnais que suite aux directives de Monsieur de la Procureur de la république à MENDE, j'ai bien versé cet argent à la CARPA de la Lozère et par l'intermédiaire de mon avocat, Maître MICHEL, celui-ci sera versé à Jared WISE par l'intermédiaire de son avocat à MONTPELLIER (34). —

*Question* : Suite au remboursement du préjudice subi par la victime, le procureur a décidé de vous restituer l'ensemble des objets que nous avons saisis chez vous en l'espèce 1 clé USB noire marque SANDISK 1TB, 1 drone HOLY STONE HS720E, 1 longue vue dans son emballage marque SPOTTING SCOPE Optical et sport systems, 1 téléphone portable de marque LG IMEI 354546110326117, 146 dollars américains (7x20 + 1x5), 840 euros en espèces (8x50 + 10x20 + 4x10 + 4x5) et 1 ordinateur portable marque LENOVO couleur gris. Reconnaissez-vous prendre connaissance de cette décision ?

*Réponse* : Je reconnais prendre connaissance de cette décision. —

*Question* : Ce jour, nous vous restituons l'ensemble des objets précités. Reconnaissez-vous en prendre possession ?

*Réponse* : Oui, je reconnais prendre possession de l'ensemble des objets qui m'ont été saisis lors de la perquisition dans mon domicile. Je reconnais que vous m'avez restitué ces biens. —

*Question* : Avez-vous des remarques à formuler ?

*Réponse* : Vous avez saisi sur mes comptes bancaires des sommes d'argent, en l'occurrence 498,94 euros sur mon compte FR 76 12406 00402 8001076280852 du Crédit Agricole et 13700 € et 800 € sur mes comptes de la société SARL LE DOMAINE DE GABRIAC auprès de la banque OLINDA n°FR76 16958 00001 69629136502 90 et n°FR76 16958 00001 04178613945 59. Je n'ai pas récupéré ces sommes d'argent comme vous me l'aviez annoncée. Vous m'informez que je dois formuler une demande auprès du procureur de la république de MENDE pour que cet argent me soit restitué sous réserve de ne pas avoir de dette auprès de l'état. Je reconnais prendre connaissance de ces informations et je vais faire ces démarches via mon avocat. Je n'ai rien d'autre à ajouter.

Lecture faite par moi des renseignements d'état civil et de la déclaration ci-dessus, j'y persiste et n'ai rien à changer, à y ajouter ou à y retrancher.

A MENDE 48000, le 7 janvier 2025 à 14 heures 55 minutes.

**La personne entendue**                          **L'Officier de Police Judiciaire**



| Form 202 | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $25 | **Certificate of Formation<br>Nonprofit Corporation** | **Filed in the Office of the<br>Secretary of State of Texas**<br>Filing #: 806097142 06/25/2025<br>Document #: 1493333680002<br>Image Generated Electronically<br>for Web Filing |

### Article 1 - Corporate Name

The filing entity formed is a nonprofit corporation. The name of the entity is :

**EDMONT FOUNDATION**

### Article 2 – Registered Agent and Registered Office

☐A. The initial registered agent is an organization (cannot be corporation named above) by the name of:

**OR**

☑B. The initial registered agent is an individual resident of the state whose name is set forth below:

Name:
**GREGORY    EDMONT DE LA DOUCETTE**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**1813 FM 69 S   SULPHUR SPRINGS  TX  75482**

### Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

**OR**

☑B. The consent of the registered agent is maintained by the entity.

### Article 3 - Management

☐ A. Management of the affairs of the corporation is to be vested solely in the members of the corporation.

**OR**

☑ B. Management of the affairs of the corporation is to be vested in its board of directors. The number of directors, which must be a minimum of three, that constitutes the initial board of directors and the names and addresses of the persons who are to serve as directors until the first annual meeting or until their successors are elected and qualified are set forth below.

| | |
|---|---|
| Director 1: **GREGORY    EDMONT DE LA DOUCETTE** | Title: **Director** |
| Address: **1813 FM 69 S   SULPHUR SPRINGS  TX, USA  75482** | |
| Director 2: **LYNNE    VOLKMAN** | Title: **Director** |
| Address: **421 West 24th Street   New York  NY, USA  10011** | |
| Director 3: **JANI    SIIVOLA** | Title: **Director** |
| Address: **1813 FM 69 S   SULPHUR SPRINGS  TX, USA  75482** | |

### Article 4 - Organization Structure

☐ A. The corporation will have members.

or

☑ B. The corporation will not have members.

### Article 5 - Purpose

The corporation is organized for the following purpose or purposes:
**The corporation is organized exclusively for charitable, educational, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986 (or the corresponding provision of any future United States**

Internal Revenue law).

Specifically, the corporation's mission is to promote emotional well-being, personal growth, and community connection by offering immersive, nature-based programs, workshops, and retreats. Activities may include experiential education in areas such as sustainable living, arts and crafts, regenerative agriculture, and conscious entrepreneurship; as well as providing space for rest, reflection, and healing in a supportive environment.

The corporation may engage in any lawful activity in furtherance of its charitable purposes, provided that such activities comply with the requirements of Section 501(c)(3).

### Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

**Attachment.pdf**

### Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Initial Mailing Address

Address to be used by the Comptroller of Public Accounts for purposes of sending tax information.

The initial mailing address of the filing entity is:
5931 Greenville Avenue
Dallas, TX 75206
USA

### Organizer

The name and address of the organizer are set forth below.

**Gregory Edmont de la Doucette        5931 Greenville Ave, Dallas, TX 75206**

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Gregory Edmont de la Doucette**
Signature of organizer.

FILING OFFICE COPY

Supplemental Provisions – Edmont Foundation

Article I – Dissolution Clause
Upon the dissolution of the corporation, its assets shall be distributed for one or more exempt purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code, or shall be distributed to the federal government, or to a state or local government, for a public purpose. Any such assets not so disposed of shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the corporation is then located, exclusively for such purposes or to such organization or organizations as said court shall determine, which are organized and operated exclusively for such purposes.

Article II – Limitation on Political Activities
No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members, directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purpose set forth herein.
No substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office.

Article III – Consent of Registered Agent
I, Gregory Edmont de la Doucette, hereby consent to serve as the registered agent for the Edmont Foundation, a non corporation to be formed in the State of Texas. I understand my responsibilities as registered agent under the Texas Business Organizations Code, including the duty to maintain a physical address in the state and to accept service of process on behalf of the organization.

Signature: _____
Name: Gregory Edmont de la Doucette
Date: _____  6-25-25

**RÉPUBLIQUE FRANÇAISE**
*Liberté*
*Égalité*
*Fraternité*

**L'Annuaire des Entreprises**

Nom, adresse, n° SIRET/SIREN... 🔍

🎁 Nouveautés•     👤 Espace agent public

# HOLDING GED

🏢 **Unité légale**  ▸ 901 099 903   **EN ACTIVITÉ**

  1 établissement

in  ✉️  ▤  🖨️

La société HOLDING GED a été créée le **24 juin 2021**, il y a 4 ans. Sa forme juridique est **SAS, société par actions simplifiée**. Son domaine d'activité est : activités des sociétés holding. En 2023, elle était catégorisée Petite ou Moyenne Entreprise. Elle ne possédait pas de salariés.

Son siège social est domicilié au LA COMBE DE FERRIERE 48160 SAINT-MICHEL-DE-DEZE. Elle possède 1 établissement.

| Fiche résumé | Dirigeants | Documents | Données financières | Annonces et observations |
|---|---|---|---|---|

**Informations disponibles sur les dirigeant(s) :**

- Liste des dirigeants inscrits au Registre National des Entreprises (RNE)
- Liste des bénéficiaires effectifs
- Délégué à la Protection des Données (DPO)

Une question ❓

**RÉPUBLIQUE FRANÇAISE**
*Liberté Égalité Fraternité*

**L'Annuaire des Entreprises**

*Nom, adresse, n° SIRET/SIREN...*    🔍

🎁 Nouveautés    ⊚ Espace agent public

## LE DOMAINE DE GABRIAC

🏢 **Unité légale** · 902 025 568    **EN ACTIVITÉ**

⌐ 1 établissement

in  ✉  ▦  🖨

La société LE DOMAINE DE GABRIAC a été créée le **4 août 2021**, il y a 4 ans. Sa forme juridique est **Société à responsabilité limitée (sans autre indication)**. Son domaine d'activité est : terrains de camping et parcs pour caravanes ou véhicules de loisirs. En 2023, elle était catégorisée Petite ou Moyenne Entreprise. Elle ne possédait pas de salariés.

Son siège social est domicilié au LA COMBE DE FERRIERE 48160 SAINT-MICHEL-DE-DEZE. Elle possède 1 établissement.

| Fiche résumé | Dirigeants | Documents | Données financières | Annonces et observations |
|---|---|---|---|---|

**Informations légales de LE DOMAINE DE GABRIAC**

Insee    INPI



**État des inscriptions** ❶    ⊘ **Inscrite (Insee)** le 04/08/2021

Une question ❓

⬇ Avis de situation

EXHIBIT

5



Home    Begin Journey    Volunteer    Contact    About Us    Donate

*"A month at this amazing place has changed me forever."* <u>Read more</u>

*My time spent with Greg at this place was amazing! I originally was unsure if it would be helpful for me and planned to stay for two weeks and ended up staying over a month. A month at this place that has changed me forever. The location is incredible, in the south part of the National Park of Les Cevennes, which is full of water springs and different types of forests. It is a bit remote, but for guests and volunteers who did not have their own way of transport, Jani would arrange all of their transportations or pick them up and drop them off at the train station. Trips down to the village were also possible always.There are hills and mountains all around with pine, chestnut, and oak trees and many natural water springs and natural swimming pools which are great for cooling off on hot summer days. The hospitality and kindness was more than I could have expected. I had nothing to think about accept inner growth outer belonging. I like to spend time alone, and so in my case all my groceries were covered and I made a lot of my own meals in my own kitchen. But a couple of times a week Greg would make a dinner which was wonderful and we would stay chatting and listening to music while sipping some good French wine! Everything was satisfying, the healing of nature, learning from an expert how to use mechanical tools for building, which was the lessons I chose for myself. We built an amazing pergola for an outdoor dining area and we completed the entire thing in about three weeks. We did it all from scratch using the materials the mountain offered. There were so many other choices to learn and just "be". Thanks again, Greg, for a great and rewarding experience in southern France, and hope to spend time with you again in the future!*

Sebastian, 28
SPAIN


Accessibility



Home     Begin Journey     Volunteer     Contact     About Us     Donate

*"Incredibly rewarding. Every day I accomplished something."* <u>Read more</u>

*I spent nearly three weeks as a volunteer at Greg's beautiful place in the middle of unspoiled nature and I definitely plan to return. He is a very kind, welcoming and respectful host who gives everyone freedom and autonomy. It was incredibly rewarding. Every day I accomplished something ... there are enough natural resources to create pretty much anything. Most importantly, every day I helped Greg and Jani to to truly help other people. Their mission is so amazing and selfless. For me, it was a dream come true.*

Jacqueline, 28
ISRAEL

‹                                                                    ›

Accessibility



**Étude de Maître Philippe ALET**
*Commissaire de Justice*
*Vice-Président délégué de la Chambre Régionale des Commissaires de Justice près la Cour d'Appel de Nîmes*
 1 Avenue du Cheyla – 48100 Marvejols /  etude.alet@wanadoo.fr /  04 66 32 10 89
**Horaires d'ouverture de l'Étude :**
Lundi au Vendredi : 9h00 – 12h30 / 14h00 – 17h30
(Vendredi jusqu'à 16h30)
 **Accueil téléphonique :** *Pas d'accueil téléphonique le mercredi - contact uniquement par mail.*

| Jour | Matin | Après - Midi |
|---|---|---|
| Lundi – Mardi – Jeudi | 10h30 à 12h00 | 14h30 à 17h00 |
| Vendredi | 10h30 à 12h00 | 14h30 à 16h00 |

**De :** frédéric MICHEL <fmichelavocat@orange.fr>
**Envoyé :** mercredi 24 septembre 2025 15:11
**À :** g edmont <gedmont@live.fr>; etude.alet@wanadoo.fr
**Objet :** Re: Urgent – Contestation de l'exécution forcée / Demande de suspension – Affaire C000586 VI/344 – WISE JARED LANE c/ EDMONT DE LA DOUCETTE Gregory

Mon Cher Maitre,

Je vous confirme que les fonds sont en CARPA et devraient être libérés au bénéfice de Me CARREL à qui j'ai conformé cela la semaine dernière.

Le virement CARPA a même peut être été effectué à ce jour.

Je me tiens à votre disposition.

Votre bien dévoué