*ATTACHMENT* *B*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

JARED LANE WISE

   Plaintiff

   v.

GREGORY EDMONT DE LA DOUCETTE

   Defendant

Case No.

*PROPOSED AMMENDED*

**COMPLAINT FOR A CIVIL CASE**

Fraud in the Inducement

---

## INTRODUCTION

1.    Jared Lane Wise (Plaintiff) is a United States citizen residing in Deschutes County, Oregon. Gregory Edmont de la Doucette (Defendant) is a United States citizen and resident of the state of Texas. Plaintiff and Defendant have been acquaintances for more than ten years via their mutual friendships with a United States citizen who resides in France.

2.    In late 2020, Defendant approached Plaintiff and proposed a joint investment in a physical real estate property located in France. Defendant had known for several years that Plaintiff was interested in purchasing a property in France, as they have discussed this topic many times. Defendant proposed the terms of the investment which Plaintiff accepted. Plaintiff then signed a Power of Attorney, which was provided by the Defendant, and wired funds totaling $189,133.19, following instructions provided by the Defendant, to France in order to complete the transaction.

Page 1 – **COMPLAINT**

3.      While Plaintiff thought he was entering a partnership and transaction in which he would own a minority share of the property, in reality Defendant engaged in a fraudulent scheme, which included multiple forged documents and international wire transfers, to defraud Plaintiff of his investment and ownership position in the real estate property.  Defendant used Plaintiff's investment to purchase the property solely in Defendant's name via multiple French corporations which he created for this exclusive purpose and hid from Plaintiff.

4.      In the end, Plaintiff has no ownership position in the property or any associated corporations and Defendant has returned none of Plaintiff's investment.  Defendant stole the entire $189,133.19 investment by purchasing the property solely in his name and returning nothing to Plaintiff.  Despite earlier suspicions, not until July, 2023 was Plaintiff first able to confirm that Defendant had in fact committed fraud against him and stolen the entire investment by purchasing the property solely in Defendant's name.

## JURISDICTION AND VENUE

5.      This case is brought as a Fraud in the Inducement complaint in an amount greater than $75,000.00 and under a diversity jurisdiction provision, as the Plaintiff is a United States citizen and resident of the State of Oregon and the Defendant is a United States citizen and resident of the state of Texas.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 because Plaintiff is a United States citizen and current resident of Deschutes County, Oregon; Defendant is a United States citizen and claims to be a resident of the state of Texas; Defendant sent various documents and communications related to the fraud scheme to Plaintiff while Plaintiff was located in Deschutes County, Oregon, Plaintiff signed and had the Power of Attorney (provided by

Page 2 – **COMPLAINT**

Defendant) notarized in Deschutes County, Oregon; and Plaintiff conducted the initial wire transfer to France from Deschutes County, Oregon.

## PARTIES

7.    Plaintiff Jared Lane Wise is a United States citizen and resident of Bend, Oregon, in Deschutes County, Oregon at the time the original complaint was filed.

8.    Defendant Gregory Edmont de la Doucette (Date of Birth: XX/XX/1966, United States passport number: XXXXXX921, residence address: Sulphur Springs, Texas), is a United States citizen.

9.    Defendant created French corporations "HOLDING GED", "SCI CHATEAU DE GABRIAC", and "LE DOMAINE DE GABRIAC", of which he is the sole ultimate owner, for the sole purpose of conducting the purchase and holding ownership of the real estate property.

## FACTUAL ALLEGATIONS

10.    Gregory Edmont de la Doucette (Defendant), a US citizen (and physically located in France during the events described in this complaint unless described otherwise), mentioned to Jared Lane Wise (Plaintiff) that Defendant was planning to purchase a real estate property in France known as La Combe de Ferrière, 48160 Saint-Michel-de-Dèze, France, and invited Plaintiff to participate as a minority investor in the property. Plaintiff and Defendant have known each other for more than ten years via their mutual friendship with a US citizen named Katherine Andrews (Katherine) who also resides in France. Defendant knew that Plaintiff was interested in purchasing a property in France as they had discussed this topic for several years.

11.    The La Combe de Ferrière property Defendant proposed for joint purchase consists of approximately 95 acres of chestnut forest, a large chateau and other smaller buildings and

Page 3 – **COMPLAINT**

improvements. Defendant described the total cost to purchase (chateau, land, other buildings, operating business, transaction fees, accountant and attorney expenses, etc.) as €1,565,000. Plaintiff and Defendant made a verbal agreement that Plaintiff would purchase 20% of the complete property and associated operations (chateau, land, other buildings, and operating business) by contributing 10% (€156,500) of the total cost before the closing date and contribute a second 10% (another €156,500) within one year of closing. Plaintiff and Defendant did not sign a formal written agreement for the purchase at the time but agreed to do so as soon as possible.

12.    Defendant mentioned discussions with a French governmental organization or department regarding assistance with grants or other assistance in purchasing or operating the forest land on the property. This organization was later learned to be known as "SAFER".

13.    A couple of years earlier, Defendant had proposed to Plaintiff to set up a company in France. Plaintiff sent Defendant €2,500 at that time to help form the company, but no business was ever created and Plaintiff had forgotten about the money and the proposed business.

14.    On January 24, 2021, Defendant emailed Plaintiff a French "Power of Attorney" document to be notarized and returned, and also a form for verifying the origin of the funds to be provided by Plaintiff. Defendant claimed that the Power of Attorney and "Origin of Funds" documents were provided by a French Notaire (In France, a "Notaire" performs more functions than a "Notary" in the United States and essentially handles the entire "Escrow" service) named Thomas Moreau.

15.    Plaintiff was unable to have the Power of Attorney document notarized in the United States as he could not locate a French speaking notary nor one that would sign for a document written in French. After Plaintiff notified Defendant of this problem, Defendant then sent Plaintiff an addendum to the Power of Attorney that he claimed was written by Notaire

Page 4 – **COMPLAINT**

Moreau. With this addendum, Plaintiff was able to have the Power of Attorney notarized in Deschutes County, Oregon, United States on January 25, 2021. Plaintiff sent the original notarized Power of Attorney and Origin of Funds documents from Deschutes County, Oregon, USA to Defendant in France via FedEx. Plaintiff also emailed digital copies of the notarized Power of Attorney and signed Origin of Funds documents from Deschutes County, Oregon, USA to Defendant in France.

16.    At the same time, Defendant separately emailed wiring instructions to Plaintiff and stressed that "It's important to use the "CENT6889" reference indicated". On January 25, 2021, Plaintiff sent the first international wire of €29,100 ($35,527.01) from his bank in Deschutes County, Oregon, USA to the Centtrip account Defendant provided. Defendant explained the amount of the initial wire as 20% (Plaintiff's total obligation) of the first 10% (€156,500) of the total purchase cost (€1,565,000) initially required by the Notaire. The remainder of Plaintiff's total 10% initial contribution would be made in a later wire transfer. The second 10% (€156,500) from Plaintiff would be due within one year of the transaction closing date.

17.    Plaintiff did not realize at the time that he was wiring funds directly to Defendant's personal account, as the wire instructions provided by Defendant listed the "Account Name" as "USD Client Acc PCSIL".

18.    On February 3, 2021, Defendant emailed Plaintiff and asked for a bank statement or utility bill in order for Plaintiff's January 25, 2021 wire to be credited by Centtrip. Plaintiff responded with an email on February 6, 2021 to Defendant with a bank statement attached.

19.    On April 21, 2021, Defendant emailed Plaintiff with Centtrip wire instructions for the second wire and confirmed receipt of Plaintiff's first wire of €29,100. Defendant explained that the second wire should be for €127,400, bringing Plaintiff's total investment to €156,500,

representing the initial 10% of the total purchase price. Defendant told Plaintiff that escrow on the property should close in "mid-May", and claimed that he was meeting soon with the Notaire to draft a partnership agreement between Defendant and Plaintiff related to the purchase and operation of the property, and that there will also be the "official deed".

20.    On April 22, 2021, Plaintiff sent a second international wire of $153,606.18 (€127,400) to the Centtrip account using the wire instructions provided by Defendant.

21.    On April 23, 2021, Defendant sent Plaintiff an email stating "money received", and forwarded an email from Centtrip to Defendant which stated that Plaintiff's second wire of $153,606.18 (€127,400) was "received" and "credited". The email from Centtrip showed that the money was received to an account with the name "EDMONT DE LA DOUCETTE GREGORY". This was the first time that Plaintiff was informed that the wire transfers were sent to an account in Defendant's name rather than directly to an account of any Notaire, although Plaintiff was not yet suspicious of any fraud as he fully trusted Defendant and was not familiar with the process to purchase real estate in France.

22.    On July 6, 2021, Plaintiff emailed Defendant asking for an update on the status of closing, which Defendant had claimed in his April 21, 2021 email would happen in "mid-May". Plaintiff did not receive a reply from Defendant to this inquiry.

23.    On July 8, 2021, Defendant sent Plaintiff a WhatsApp message claiming he was meeting with the bank in Nimes, France to set up the SCI (French corporation) and then "we're in business".

24.    On July 27, 2021, Plaintiff sent a WhatsApp message to Defendant asking "Have we closed on the house yet?". Defendant responded the next day with "not yet, aiming for the 23rd".

Page 6 – **COMPLAINT**

25.     On August 13, 2021, Plaintiff sent a WhatsApp message to Defendant asking to talk that weekend so Plaintiff could understand the structure of the purchase to discuss with his accountant. Defendant did not respond.

26.     On August 14, 2021, Plaintiff sent Defendant another WhatsApp message asking to confirm everything regarding the purchase in order to prepare for filing his US taxes. Plaintiff, becoming slightly concerned about the investment, offered Defendant an opportunity to purchase the property by himself if he would prefer. Defendant responded that "there is really nothing that impacts your US tax situation at all at this point, just like mine or Kat's or anyone else investing in property overseas. Only when it makes money."

27.     On August 16, 2021, Defendant responded to Plaintiff with a WhatsApp message describing the French corporate structure that he had created to purchase the property on behalf of himself and Plaintiff. Defendant described a holding company called "HOLDING GEDJW" with its shares owned 50% by Defendant and 50% by Plaintiff. This was inconsistent with the 20% that Plaintiff had agreed to purchase, but Defendant described it as a lawful way to initially structure the transaction and minimize tax consequences on "our investment". Defendant claimed the company was funded with €1,700,000, including €5,000 from the earlier alleged business to which Plaintiff contributed €2,500 and never received any documentation and the "€155,000" recently wired by Plaintiff (although Plaintiff actually contributed €156,500 plus the earlier €2,500).

28.     Defendant also described two other French subsidiary companies held by "HOLDING GEDJW", including an "SCI" called "SCI CHATEAU D'ALTEYRAC" which would purchase the residence, all property and all structures, and a "SARL" which would operate the related rentals, campground, events, etc. Defendant claimed that there would also be two

additional companies in the future – one for exploitation of the forest and one for exploitation of the agricultural land.

29.    Defendant acknowledged Plaintiff's request for "an agreement" and stated that he intended to have his French notary or lawyer write one, but they were not comfortable drafting a document that said Plaintiff owned 20% of a property that Defendant already assigned Plaintiff 50%, and they were not comfortable reducing Plaintiff's shares without Plaintiff being physically present in France.

30.    Plaintiff responded to Defendant stating that Plaintiff wanted to know accurate information to provide to his US accountant and to ensure that Plaintiff is properly following all US Internal Revenue Service reporting requirements for foreign property. Plaintiff repeated his request for a partnership agreement and asked again for copies of all legal documents, corporate capitalization tables, and bank account info related to his investment and the property.

31.    On August 17, 2021, Defendant responded with a WhatsApp message saying that he will "send an email now asking for my lawyer for copies of documents". Defendant also reassured Plaintiff that this corporate structure was reviewed by Defendant's brother Jeffrey Doucette (Jeffrey), the former "US tax attaché at the US embassy" and that "everything is in order" (Defendant's brother previously worked with Katherine at the US Embassy in Paris as an "Assistant Tax Attaché").

32.    Unknown to Plaintiff at the time, on August 30, 2021, Defendant forwarded an email from Notaire Moreau to Katherine which contained a letter from Notaire Moreau to Defendant describing the total price to be paid for the property as €662,500 and an anticipated closing date of September 8, 2021. The letter contained an entry for "Honoraires SAFER" for €32,400. Katherine claims that she was not aware at the time that Plaintiff was investing in the

Page 8 – **COMPLAINT**

property, but later provided the email to Plaintiff after Plaintiff informed her of his involvement and his concerns that Defendant had stolen it.

33.    Unknown to Plaintiff at the time, on September 4, 2021, Defendant forwarded Katherine an email from BNP Paribas. The email contained a document from BNP Paribas with wire transfer information related to the closing. Amounts described in the document included €652,550 for "CHATEAU DE GABRI" and €11,800 for "LE DOMAINE DE GA", which generally corresponded with the amounts listed in the August 30, 2021 letter from Notaire Moreau to Defendant.

34.    On September 7, 2021, Defendant sent Plaintiff a WhatsApp message saying that "tomorrow is the big day! Signing at 2 pm". Defendant claimed he was "meeting with the notaire an hour ahead of time to go over updated documents, including bank or utility statements for proof of address for those who contributed funds because it has been more than three months since we last provided them". Defendant asked Plaintiff to send Defendant the "most recent version of whatever statement proof of address you used last time", and promised that "I'll email you copies of the docs after it's all signed".

35.    On September 8, 2021, Defendant closed on the property with Notaire Moreau. Defendant sent Plaintiff a video from the closing which shows the female seller of the property and two other men – one of whom appears to be the Notaire Moreau and the second is believed to be Xavier Meyrueix from SAFER.

36.    On September 15, 2021, Plaintiff sent Defendant a WhatsApp message asking "Now that we've officially closed on the property, could I get copies for my records of the incorporation documents for the ones I have an interest in, and/or the closing documents for the property?". Defendant responded that he was waiting for an electronic version of the signed deed

from the Notaire and will send him a reminder. Defendant also claimed to have spoken with a new, English-speaking Notaire who will draft an agreement between Plaintiff and Defendant, and that the new Notaire did not have a problem reducing Plaintiff's ownership share to 20% from the 50% allegedly listed in Plaintiff's name.

37.     Following the closing, Defendant provided no documentation that Plaintiff expected would be forthcoming, but instead sent Plaintiff many videos and photos of celebratory meals, the property, etc.

38.     On September, 22, 2021, Plaintiff sent Defendant a WhatsApp message asking if Defendant had heard back from the attorney about the incorporation documents. Defendant responded "no I haven't heard back but that is not unusual. I won't forget to forward as soon as I do."

39.     In late September and early October, 2021, Plaintiff became increasingly concerned due to the lack of details or documents related to the corporate structure or closing. Plaintiff noticed that one of Defendant's WhatsApp accounts was titled "Domaine de Gabriac" and had a photo of the property Plaintiff and Defendant were to purchase together, making Plaintiff curious due to Defendant's claim that the property was to be called "Chateau de Alteyrac".

40.     Plantiff searched online for "Domaine de Gabriac" and found French incorporation documents for companies named "HOLDING GED", "SCI CHATEAU DE GABRIAC", and "LE DOMAINE DE GABRIAC", which were solely owned by Defendant, but was unable to find any documents for "HOLDING GEDJW", "SCI CHATEAU D'ALTEYRAC" or any related "SARL" as described by Defendant on August 16, 2021 (Defendant had described them as already existing at that time). Plaintiff was unable to find any corporations in France associated with Plaintiff's name.

Page 10 –  **COMPLAINT**

41.    The "HOLDING GED", "SCI CHATEAU DE GABRIAC", and "LE DOMAINE DE GABRIAC" documents showed these companies (owned 100% by Defendant) purchasing the La Combe de Ferriere property and associated operating business for €645,000 and €10,000 respectively. These amounts are generally consistent with the amounts described in the August 30, 2021 letter from Notaire Moreau to Defendant and the September 4, 2021 email from BNP Paribas, although Plaintiff was not aware of those documents at this time.

42.    In October, 2021, Defendant left France for a two-week trip to the United States. Defendant and Plaintiff met in person in Palm Springs, California on October 17, 2021, where Defendant again described the "HOLDING GEDJW" corporate structure and promised to send Plaintiff copies of the incorporation and closing documents when he received them.

43.    Defendant invited Plaintiff to dinner that evening with Defendant and Defendant's brother Jeffrey, but asked Plaintiff not to mention Plaintiff's investment in the France property as Jeffrey did not know Defendant had any investment partners. Plaintiff was surprised and concerned by this as Defendant had earlier claimed that Jeffrey had reviewed the transaction, but out of courtesy, Plaintiff honored Defendant's request and did not mention his investment to Jeffrey.

44.    On October 18, 2021, Plaintiff tried multiple times to reach Defendant via telephone but was not successful. Plaintiff then sent Defendant a WhatsApp message expressing confusion about Defendant's earlier claim that Jeffrey had reviewed the corporate structure but yet Defendant claimed the night before that Jeffrey did not know of any partners in the transaction. Plaintiff also sent short videos of the incorporation documents for Defendant's "HOLDING GED", "SCI CHATEAU DE GABRIAC", and "LE DOMAINE DE GABRIAC" companies that Plaintiff found online (Defendant had never mentioned these companies to Plaintiff and Defendant was not yet aware that Plaintiff had discovered them) and asked if there were other corporations that

Page 11 – **COMPLAINT**

included Plaintiff's name (as in the "HOLDING GEDJW companies described by Defendant in the August 16, 2021 WhatsApp message).

45.    Defendant called Plaintiff a few hours later and responded angrily with many personal insults. Defendant claimed that he only meant that Jeffrey thought Plaintiff was invested at 50%, and Defendant did not want him to know that Plaintiff was only going to invest 20% when Defendant had actually put Plaintiff as a 50% owner.

46.    Defendant then emailed Plaintiff two incomplete, unexecuted draft documents related to "HOLDING GEDJW". Defendant stated "I'll send the longer ones later. FYI, for my other holding company, it took me almost six months to get it officially registered – I started the process when I first made the offer and it only just showed up a few weeks ago". These two incomplete drafts were the only records or documents Defendant ever provided to Plaintiff in any way related to the corporate structure he described on August 16, 2021. These drafts appear to be altered versions of the documents used to create Defendant's "HOLDING GED" corporations.

47.    Defendant also never provided Plaintiff with any documents related to the property purchase transaction, ownership deed, partnership agreement, etc.

48.    On December 31, 2021, having not received any contact from Defendant since October 18, 2021, Plaintiff asked Defendant for documents related to the transaction so Plaintiff could provide them to his accountant. Defendant responded by saying that he was on Madeira Island and wished Plaintiff a happy New Year, but ignored Plaintiff's request for documents.

49.    On February 25, 2022, Plaintiff sent a message via Signal to Defendant asking for information related to any foreign property or bank accounts in which Plaintiff held an interest. Defendant provided no response.

Page 12 – **COMPLAINT**

50.    On February 27, 2022, Plaintiff sent a message to Defendant via Signal asking for information related to required US tax disclosures of income or loss due to investments in a foreign country and asked to discuss this with Defendant.

51.    On February 28, 2022, Defendant responded via Signal that there is no reporting requirement on a US tax return for investing in a home abroad, and that US citizens are only required to report income or loss, foreign taxes paid, and any bank accounts held, and that "you have none of those". This was contrary to Defendant's claim in August, 2021 that Plaintiff was a 50% shareholder in the "HOLDING GEDJW" holding company which owned the buildings, land and operating companies. Defendant also wrote that "I think the bigger issue is documentation which I do want to discuss with you and I will get back to you". At no time did Defendant ever provide Plaintiff with any information related to revenue, expenses, income, loss, bank accounts, or any other activities which would be expected from operations of a business of which Plaintiff allegedly owned 50%.

52.    On March 1, 2022, Plaintiff sent Defendant a message on Signal offering to withdraw from the deal if Defendant preferred to own the property by himself. Plaintiff received no response from Defendant.

53.    On March 2, 2022, Plaintiff sent Defendant a message on Signal stating that it had been six months since the transaction was closed, that Plaintiff had not received any documentation related to the purchase, and that Plaintiff needed to be provided with relevant records. Defendant responded via Signal that "I was also very clear that for significant tax and capital gains purposes, at close of escrow, on paper, it would be a residential property and we would be 50/50 owners via a limited holding company (societe anonyme, in French): and that after the sale, you would have to come to France to personally sign off on any reduction of ownership, as my notaire was not

Page 13 –  **COMPLAINT**

comfortable with me doing that by proxy on your behalf: it's one thing to buy/give someone something by procuration, but another to take shares away"). Defendant also discussed the expense that would be encountered to "reduce your shares".

54.    Defendant acknowledged that Plaintiff had asked for documentation related to the purchase more than five times.

55.    Defendant then attempted to falsely blame Plaintiff for not providing the second €156,600 as the cause of the problem, although the second payment was not due until one year after the transaction closing date (September 8, 2022).

56.    On March 21, 2022, Plaintiff sent Defendant a message via the Signal messaging app that the US tax filing deadline is in less than four weeks and Plaintiff needed documentation for his investment and asked to have a call with Defendant. Defendant responded on March 21, 2022 that he was trying to speak with the new notary to seek a less expensive way to extricate Plaintiff from the transaction, "which seems like that should be the first choice of solutions".

57.    On March 26, 2022, Plaintiff suggested that Defendant return Plaintiff's full investment and remove Plaintiff from any positions in the property or related companies.

58.    On March 28, 2022, Plaintiff spoke with a United States citizen who lives in the United States and has experience working in French real estate transactions. This person expressed concern that the transaction was a fraud scheme and recommended that Plaintiff seek counsel from an English-speaking attorney in France.

59.    On March 28, 2022, Plaintiff notified Defendant via email, Signal and WhatsApp that Plaintiff was fully revoking the Power of Attorney that Plaintiff had sent to Defendant on January 25, 2021, and asked that Defendant take no further financial actions in his name in France or anywhere else. Plaintiff later learned later that this Power of Attorney was a forgery, but was

Page 14 –  **COMPLAINT**

not aware at this time. Plaintiff also informed Defendant that Plaintiff was aware that the "HOLDING GEDJW" companies did not exist, that Defendant had purchased the properties entirely in his own name, and requested that Defendant return Plaintiff's investment.

60.    Defendant responded that Plaintiff's name was on the deed by writing "I absolutely agree that I should you should not have any part of this, and that was my sole intention of going to the notaire last week, which I did, and it is not as simple as me just removing your name from a deed".

61.    Defendant wrote that "Your power of attorney only gave me the power to sign for a home purchase, not to set up companies (or bank accounts) in your name. If you really want to do your research, do it carefully and you can see that NO residential property except my Grimaud property has yet been assigned to the various companies I have set up in my own name, only businesses I have set up". This claim was contradictory to Defendant's claims in August 16, 2021 that the corporate structure (which allegedly included Plaintiff as an owner) had already been established and funded.

62.    Defendant then claimed that only one of the companies he described to Plaintiff had not been created and claims that Plaintiff's name was on the "residential deed" by writing "The one company that is not finalized is the joint holding of which you are a part, in the sense that I have assigned you 50% of the shares, which technically don't have any value (the capital account used to register the company is simply to set it up, and in my name) and won't, until you do come over to sign, I can neither take that capital money out to use, nor take you OFF the separate residential deed and transfer it to that company".

63.    On April 5, 2022, Defendant sent Plaintiff a message on Signal saying "there is no quick, easy or free fix to getting you completely off the property, but there are a few options and

Page 15 – **COMPLAINT**

both of the two I think i could consider would require me selling or taking a loan out against my Grimaud property. i need more advice and planning. in the meantime, I have asked the notaire to draft a document stating the amount you contributed and our mutual desire for you to have no ownership and to have funds returned to you".

64. On April 13, 2022, Defendant sent Plaintiff two voice recordings via Signal claiming that Plaintiff's name was on the residential deed as a 50% owner. Defendant tried to blame Plaintiff for causing the problem by not sending the second 10% payment (which per the original agreement was actually not due until September 8, 2022). Defendant described tax consequences and other expenses totaling "sixty-something thousand Euros" that will result from removing Plaintiff's name from the residential deed and returning his money. Defendant's voice messages include the following statements:

65. "I know I was manipulating the tax system. It's me, I accept that but I did nothing to you."

66. "we're buying it as if it's a personal property, residential, 50/50".

67. "It is one thing by procuration to acquire something in someone's name, I could certainly never take stuff from you".

68. "Whether you believe it or not, and you could get the papers, you'd have to come to France, but you are on paper 50% owner of my home that I put two million into, based on what you put in too and my son's inheritance."

69. "The only thing you want is your money back, after all this, and that's what we need to figure out to happen. And I have talked to this new notaire, and the bottom line is that, what looks like the least expensive way is for me to buy you out at that 155 that you put in, and basically commit, I hope its minor, fraud but imply that I did not realize that by saying and writing

Page 16 – **COMPLAINT**

on paper that 50% of the funds were coming from you, that the plan was for you to pay over time to me, and I don't think that's a thing that anyone's going to go to jail for, but by doing that and hopefully then justifying why I am only paying 155,000 for what's worth, you know, half of a €2,000,000 property, and in case there is an audit".

70.     "I'm going to have to take a loan against my Grimaud property to pay it and to get you your money back. And that's gonna cost me about €5,000 in loan points. And I have to do it against that house because I can't get a loan against the new place because without you coming over and signing as well because you're a part owner".

71.     "And in the meantime, I'm nudging the notary to draft a document that at least acknowledges this exchange of money and that we're working out a solution."

72.     On May 1, 2022, Plaintiff contacted an English-speaking attorney in France and soon retained his services to investigate what happened to Plaintiff's investment.

73.     On September 30, 2022, Plaintiff notified Katherine for the first time about Plaintiff's investment in the property and his concerns that Defendant had stolen the money. Soon after, Katherine asked Defendant about Plaintiff's investment. Defendant acknowledged to Katherine that he and Plaintiff had agreed that Plaintiff would buy 20% of the La Combe de Ferriere property via the "HOLDING GEDJW" corporate structure that Defendant had created, and that Plaintiff had wired €156,500 to Defendant for this transaction.

74.     Defendant falsely told Katherine that Plaintiff's entire €156,500 investment was sitting in a "HOLDING GEDJW" bank account at BNP Paribas, but that Defendant could not access the money to return it to Plaintiff, due to Plaintiff's canceling the Power of Attorney. When Katherine pressed Defendant for details, he became vague and ended the conversation, claiming that he would let attorneys handle the dispute.

Page 17 – **COMPLAINT**

75.     On October 28, 2022, in response to an email from Plaintiff's French attorney requesting information related to the Power of Attorney and property transaction, Notaire Moreau denied drafting the Power of Attorney that Defendant provided to Plaintiff on January 24, 2021 and that Plaintiff had notarized. The Power of Attorney that Defendant provided to Plaintiff was a forgery.

76.     On February, 2023, Plaintiff's attorney sent Defendant a letter demanding documentation related to the purchase of the property or a return of Plaintiff's money. The letter was sent via regular mail, email and registered mail. Defendant received the letter on February 17, 2023 via registered mail but Defendant provided no response to Plaintiff or his attorney, and did not return any of Plaintiff's investment.

77.     In April, 2023, Plaintiff's attorney received a response from local French authorities confirming that Defendant purchased the property in the name of himself and his "HOLDING GED" companies, and that Plaintiff has no ownership position in the property.

78.     In April, 2023, Defendant traveled to the United States. Katherine sent Defendant a message on WhatsApp asking Defendant about the demand letter sent by Plaintiff's French attorney and warned Defendant that Plaintiff was planning to make criminal referrals and file civil lawsuits in France and in the United States. Defendant did not reply. Later, Katherine told Plaintiff that she and Defendant spoke, that she told Defendant that he needed to "fix this and make it right" with Plaintiff, and Defendant paused and replied "Yeah".

79.     On July 3, 2023, Plaintiff's French attorney received a copy of the "Acte de Vente" (formal transaction and deed document) from French authorities. This document was the final confirmation that the property was purchased solely in the name of Defendant's company "SCI

Page 18 – **COMPLAINT**

CHATEAU DE GABRIAC" for a total price of €645,000.00 and that Plaintiff holds no ownership position. Notaire Moreau is listed as the conductor of the transaction.

80.    On August 16, 2023, Katherine visited Defendant in person at the La Combe de Ferriere property to ask about Plaintiff's investment. Defendant was inside the home but refused to come outside, meet or speak with her.

81.    In June, 2024, Defendant emailed Plaintiff, stating "I need to return your money" and "the next message to you on my behalf will be from a representative with that question and perhaps a few other questions or conditions before a wire is sent". This was the first contact Plaintiff had received from Defendant in more than two years. As of the date of filing of this lawsuit, Plaintiff has received no further contact from Defendant or any "representative", nor has any money been returned to Plaintiff, and it is clear that Defendant is continuing in his scheme to defraud Plaintiff.

82.    To date, Defendant has not returned any of Plaintiff's investment, has provided no documentation related to any corporation in which Plaintff holds an interest, has provided no documents related to the property purchase transaction, has provided no ownership deeds or documents related to the La Combe de Ferriere property, has provided no information related to bank accounts in which Plaintiff has an interest, has made no contact with Plaintiff's attorney, and has provided no further explanation of what was done with Plaintiff's investment. Defendant has refused to speak with Plaintiff since October 18, 2021 and has only communicated in any manner one time since May, 2022.

## FIRST CLAIM FOR RELIEF

### Fraud in the Inducement

Page 19 – **COMPLAINT**

83. 1) The Defendant voluntarily and intentionally devised and participated in a scheme to defraud Plaintiff out of money; (2) the Defendant used false claims, mail, email, international wires, banking systems in the United States and France, and forged documents for the purpose of executing the scheme; (3) the Defendant did so with the intent to defraud; and (4) the Defendant did in fact defraud Plaintiff

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief against the actions of Defendant:

1. The total amount of the fraud conducted by Defendant of $191,808.19 (the two wires totaling $189,133.19 plus the earlier $2,675.00 (€2,500 at the current exchange rate of 1.07 USD/Euro)

2. Actual expense for French attorney and other expenses directly related to efforts to uncover Defendant's fraud scheme and recover Plaintiff's investment, in an amount to be determined later (Plaintiff has incurred approximately $55,000.00 to date and expects to incur significantly more)

3. Loss of value due to inflation (per the United States Bureau of Labor Statistics website, cumulative, compounded inflation to date has been approximately 80% since Plaintiff wired the money to Defendant) and opportunity cost directly related to the amount of the fraud to be calculated later.

4. Other direct, tangible costs such real estate transaction expense and capital gains tax that were incurred by Plaintiff as a direct result of Defendant's fraud, to be calculated later.

Page 20 – **COMPLAINT**

5. Punitive damages for intentional infliction of Pain and Suffering in the amount of $250,000.00

DATED this 29th day of January, 2026.

_____
Jared L. Wise, Pro Se

Page 21 – **COMPLAINT**